**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| EDMOND BENTON,<br><br>Plaintiff,<br><br>v.<br><br>DOREEN STANZIONE, *et al.*,<br><br>Defendants. | No. 22cv1476 (EP) (SDA)<br><br>**MEMORANDUM ORDER** |

**PADIN, District Judge.**

Plaintiff Edmond Benton, a civilly committed resident of the Special Treatment Unit ("STU") at the Adult Diagnostic and Treatment Center ("ADTC") in Avenel, New Jersey, who is civilly committed under New Jersey's Sexually Violent Predator Act ("SVPA"), N.J. Stat. Ann. § 30:4-27.24 *et seq.*, brings the sole remaining claim in this action against five employees of the New Jersey Department of Corrections ("DOC"): Administrator Robert Chetirkin, Associate Administrator Jeffrey Crothers, Sergeant Keith Loney, Sergeant Erik Grosskopf, and Senior Corrections Officer Luis Correa-Marti (collectively, the "DOC Defendants"). Plaintiff argues that the DOC Defendants retaliated against him in violation of the First Amendment by subjecting his cell to excessive and destructive searches because he filed this lawsuit.

The DOC Defendants move for summary judgment, D.E. 107 ("Motion" or "Mot."), and file a supporting brief, D.E. 108 ("Def. Br."). Plaintiff opposes. D.E. 114 ("Opp'n"). The DOC Defendants reply. D.E. 117 ("Reply"). The Court has reviewed the parties' submissions and decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons below, the Court will **GRANT in part** and **DENY in part** the Motion.

# I. BACKGROUND

## A. Factual Background[1]

Plaintiff has been civilly committed to the STU since June 23, 2015, following completion of a penal sentence for an underlying repeat offense, pursuant to the SVPA. *See* D.E. 108-3, Ex. G, Certification of Counsel ("Coffey Cert."); D.E. 108-5 ("Benton Dep.") at 11:8–24; D.E. 108-4, Ex. F at 2. The STU is jointly operated by the DOC and the New Jersey Department of Health ("DOH"); DOH is responsible for treatment, and DOC is responsible for custody and the facility's safety and security. D.E. 107-5, Ex. E, Resident's Guide to the STU ("Resident's Guide") at 4; D.E. 108-2, Certification of Major Khasima Alexander ("Alexander Cert.") ¶ 3; D.E. 108-6, Ex. H, Internal Management Procedure Special Treatment Unit #A-8 ("IMP") at 4. The Resident's Guide states that residents' rights, including the right to privacy, "may be curtailed, suspended or denied . . . when [DOC] staff determines that such restrictions are necessary to protect the Residents, staff, general public, or property, or to ensure the safe, secure and orderly operation of the facility, or for other good cause." Resident's Guide at 54–55.

DOC custody staff are required to search resident housing areas "on a routine and continuing basis," and "frequent, unannounced searches . . . shall be conducted as often as necessary to ensure the safety and security of the facility." IMP at 4, 9. Searches are conducted "to detect and prevent the introduction of contraband, to recover missing or stolen property and to prevent escapes and other disturbances," *id.* at 5, and policy requires that searches be conducted in a manner that avoids unnecessary force, embarrassment, or indignity, and prohibits their use as

[1]The facts in this section are drawn from the DOC Defendants' Statement of Material Facts, D.E. 108-1 ("SOMF"), to the extent undisputed, *see infra* Section II, and, where Plaintiff has identified a genuine dispute, from the record materials cited in the parties' briefing, principally Plaintiff's deposition testimony. Allegations from the TAC are identified as allegations and are not treated as Rule 56 evidence.

discipline or punishment, *id*. There are "routine" and "non-routine" searches: routine searches are daily searches conducted by the staff assigned to a given unit, while non-routine searches are conducted separately from, or in addition to, routine searches, either at random or because staff have noticed suspicious circumstances. D.E. 108-7, Ex. I, Transcript of the Deposition of Officer Luis Correa-Marti ("Correa-Marti Dep.") at 21:21–25, 22:5–15, 23:8–24. Neither type of search is announced in advance, and a staff member may conduct more than one search in a day. *Id.* 24:17–25:23, 25:24–26:1.

The parties dispute what search recording practice applied in 2022. Plaintiff testified that officers then "normally" used a handheld camcorder to record a cell before, during, and after a search. Benton Dep. 85:11–86:9. By contrast, Correa-Marti testified that fixed unit cameras provided coverage and that officers did not have to record each search individually until a body-worn-camera policy took effect in early 2024. Correa-Marti Dep. 32:2–33:24.

Plaintiff has a documented history related to the use, possession, and suspected sale of contraband at the STU, including: (1) a 2018 incident in which he was found in possession of tobacco and, separately, tested positive for morphine; (2) a 2018 body-cavity search prompted by suspicion that he received contraband from a visitor; (3) a 2018 tip that he was receiving smuggled drugs; and (4) a 2021 search that recovered a cell phone and charger from his cell. SOMF ¶¶ 23–25.

In the spring of 2020, the COVID-19 pandemic led DOC to suspend and modify various STU programs and services, and by January 2022 the STU began to substantially "re-open." *Id.* ¶¶ 26–31. In late February 2022, in response to an increase in contraband finds—including cell phones, suspected controlled dangerous substances, tobacco, and SD memory cards—Administrator Chetirkin instructed staff to form a dedicated ADTC Search Team, which deployed

on or about February 23, 2022, and conducted increased searches throughout the STU. *Id.* ¶¶ 32–34. The Search Team also conducted increased searches of residents who appeared on DOH lists for additional urine ("U-Tox") drug screening; Plaintiff appeared on such lists in May 2022 and again, on a more extensive list, in May 2023. *Id.* ¶¶ 35–37. As of July 17, 2023, the Search Team transitioned to an "as needed" schedule. *Id.* ¶ 38.

Plaintiff filed this action, *pro se*, on March 10, 2022. *Id.* ¶ 39. The Third Amended Complaint ("TAC"), alleges that, beginning in 2022, the DOC Defendants "began a targeted campaign of an illegal pattern of conducting unwarranted and destructive searches of Plaintiff's cell." D.E. 73 ("TAC") ¶ 36. It alleges that DOC officers repeatedly "tossed" Plaintiff's cell—disrupting, contaminating, or destroying his personal property, food, and belongings—under the pretext of a routine search. *Id.* ¶ 38. On one such occasion, Plaintiff alleges that Defendant Grosskopf and other officers destroyed his headphones, television, and radio, used the same gloves with which they had searched his toilet to handle perishable food, and tore the stuffing from his pillow; when Plaintiff asked why, Defendant Loney punched him in the face and pushed him into a wall. *Id.* ¶ 39. The TAC identifies searches of Plaintiff's cell on March 22, 24, 27, and 30, 2022; July 2 and 12, 2022; and May 1 and 23, 2023. *Id.* ¶¶ 40–43, 45, 47, 50, 78; SOMF ¶ 54. It does not identify which officers were involved in the March 2022 searches, alleges only that "unknown" officers were involved in the May 1, 2023 search, and does not identify any officer involved in the May 23, 2023 search either. TAC ¶¶ 40–43, 47, 50; SOMF ¶¶ 55–56. At his deposition, however, Plaintiff testified that Grosskopf ordered the March 24, 2022, search and directed that Plaintiff be moved to a first-floor cell. Benton Dep. 74:11–75:1.

As to Defendant Correa-Marti, the TAC alleges that after Plaintiff filed his original complaint in March 2022, Correa-Marti "evidently learned that he was a named defendant, even

though the [c]omplaint was never formally served," and began retaliating against Plaintiff. TAC ¶¶ 76–77. Around July 2, 2022, the TAC alleges, Correa-Marti ordered Plaintiff out of his cell, asked him "a barrage of questions" about his allegations, and asked whom he had been talking to about "legal matters," before conducting a "non-routine" search without a supervisor present and without videotaping. *Id.* ¶¶ 78–81. On or about July 12, 2022, the TAC alleges, Correa-Marti again failed to videotape a cell search and, on information and belief, mislabeled a non-routine search as "routine." *Id.* ¶¶ 45–46. At his deposition, Plaintiff testified that Correa-Marti conducted one search without a handheld camera, appeared to read papers from a folder marked "attorney/client privilege," and, on leaving the cell, asked whom Plaintiff had been speaking to about a "legal matter." Benton Dep. 78:2–79:11, 83:18–85:10. Plaintiff could not recall the date without consulting other documents and vacillated between May 2022 and May 2023. *Id.* 80:9–21, 81:5–11. He acknowledged that he had not told Correa-Marti before the search about any lawsuit against him. *Id.* 81:23–82:5. Correa-Marti, for his part, testified that he did not learn of this lawsuit until DOC personnel informed him of it on October 23, 2023. Correa-Marti Dep. 18:25–19:12; SOMF ¶ 45.

Plaintiff testified that he could not independently recall the dates of the searches underlying his claim and relied on the TAC and his contemporaneous JPay grievances for those dates. Benton Dep. 36:13–18, 143:10–144:1. He acknowledged that he was not always present for searches and could not always identify which officer was responsible for particular damage—for example, he could not identify who damaged his television or headphones because "[t]hey were searching my room five times a week, sometimes twice in a day" and he was not present when the damage occurred. *Id.* 37:10–38:3, 40:5–9, 42:8–19. As to supervisory involvement, Plaintiff stated in his deposition that Sergeants Loney and Grosskopf "were supervising the searches," *id.* 42:21–23, and

elsewhere testified they were "more than likely" supervising the searches "[b]ecause they were the Sergeants who were working the unit," *id.* 112:17–113:3. Plaintiff also testified that Loney personally ordered searches of his cell on multiple occasions. *Id.* 116:4–19, 119:8–120:11. As to Administrator Chetirkin, Plaintiff recounted that Chetirkin, responding to one of Plaintiff's grievances, admitted he was "aware of what was going on and it was under his tutelage and direction that these things were going on[] . . . [a]nd he supported what was going on." *Id.* 115:2–22. Plaintiff further testified that when he told Chetirkin that Correa-Marti had failed to document a search, Chetirkin responded, "how do you know, you're not able to see the books." *Id.* 117:17–118:2. No testimony was elicited specifically regarding Defendant Crothers; the record instead reflects that Crothers personally reviewed and closed two of Plaintiff's JPay grievances, responding "This is redundant. TY" to one, and explaining the STU's search frequency and purpose in response to another. D.E. 107-15, Ex. GG; D.E. 107-16, Ex. HH.

The DOC's contemporaneous responses to several of Plaintiff's grievances stated that the searches were "not targeted" and reflected a facility-wide increase "due to the large amount of contraband present." D.E. 107-10, Ex. BB; D.E. 107-11, Ex. CC; D.E. 107-12, Ex. DD. Plaintiff was also instructed to file a Lost, Damaged or Stolen Property claim regarding his property-related complaints, a process he had been aware of since his admission to the STU; he filed one such claim, concerning a February 2024 search not among those at issue in the TAC, but was unable to produce the required property claim forms for the searches the TAC identifies. SOMF ¶¶ 68–73. Plaintiff testified that the searches left him "angry," "frustrated," and "emotionally charged"—particularly regarding officers' use, on perishable food, of the same gloves used to search his toilet—and his contemporaneous JPay grievances describe the searches

as "affecting my mental health" and his "ability to effectively participate in meaningful therapy." Benton Dep. 35:14–19; D.E. 107-10, Ex. BB.

**B. Procedural History**

Plaintiff's original, handwritten complaint, D.E. 1, named as defendants the DOH Defendants (Dr. Doreen Stanzione and Shantay Brame Adams) and four of the DOC Defendants (Chetirkin, Crothers, Grosskopf, and Loney), but not Correa-Marti. SOMF ¶¶ 39, 41. Because the original complaint was illegible, the Court directed Plaintiff to file an amended pleading; Plaintiff's First Amended Complaint, D.E. 11, filed September 16, 2022, added Correa-Marti as a defendant. *Id.* ¶ 42. After the Court appointed *pro bono* counsel, Plaintiff filed a Second Amended Complaint ("SAC"), D.E. 19, on August 22, 2023. *Id.* ¶ 43. Summonses issued on September 27, 2023. *Id.* ¶ 44.

Defendants moved to dismiss the SAC. By Opinion and Order dated September 13, 2024, the Court granted the motion in part and denied it in part. D.E. 68, 69. The Court dismissed the DOH and DOC, as entities, *with prejudice* under 28 U.S.C. § 1915(e)(2)(B)(iii); dismissed Counts I and II—Fourteenth Amendment and New Jersey constitutional claims premised on inadequate treatment—*without prejudice* for improper group pleading; and, as to Count III, the First Amendment retaliation claim premised on the cell searches, held that Plaintiff had adequately alleged personal involvement by Correa-Marti, Loney, and Grosskopf, but dismissed the claim without prejudice as to Chetirkin and Crothers for the same group-pleading deficiency. D.E. 68, at 8–9. Because Stanzione and Brame Adams were named only in Counts I and II, the Court directed the Clerk to terminate them as defendants. *Id.* at 9. The Court also denied qualified immunity on Count III at the pleading stage, expressly noting the defense could be revisited once the factual record was developed, *see infra* Section III.D, and granted Plaintiff thirty days to file a third amended complaint addressing the deficiencies identified. *Id.* at 14–15.

Plaintiff filed the TAC on November 13, 2024. *See* Dkt. As relevant here, the TAC re-pleaded a First Cause of Action (Fourteenth Amendment due process) and Second Cause of Action (N.J. Const. art. I, ¶ 12), both against Stanzione, Brame Adams, Loney, and Chetirkin and both premised on the denial of adequate treatment, and a Third Cause of Action for First Amendment retaliation against Stanzione, Loney, Chetirkin, Grosskopf, and Correa-Marti, premised on the cell searches. Although the Third Cause of Action does not identify Crothers as a defendant, Crothers remained in the caption, and both sides treat the retaliation claim as pending against him. TAC at 16. On August 28, 2025, Plaintiff and the relevant Defendants stipulated, under Federal Rule of Civil Procedure 41(a)(1)(A)(ii), to dismiss the First and Second Causes of Action without prejudice and to dismiss all claims against Stanzione and Brame Adams with prejudice; the stipulation left the Third Cause of Action "active and open" as to the remaining defendants. D.E. 100. The retaliation claim is accordingly the sole claim that remains in this action; the parties treat it as pending against Chetirkin, Crothers, Loney, Grosskopf, and Correa-Marti.

The DOC Defendants moved for summary judgment on the remaining claim, in its entirety, on January 21, 2026. Mot; Def. Br. Plaintiff opposed on March 6, 2026. Opp'n. The DOC Defendants replied on March 27, 2026. Reply.

## II. LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is "material" if it might affect the outcome under governing law, and a dispute is "genuine" if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of showing the

absence of a genuine issue of material fact; once that burden is met, the nonmoving party "may not rest upon the mere allegations or denials of his pleading" but must point to specific, admissible evidence establishing a genuine issue for trial. *Id.* at 248, 256; *Celotex*, 477 U.S. at 324. The Court views the evidence, and all reasonable inferences drawn from it, in the light most favorable to the nonmoving party, *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), except where the non-movant's version of events "is blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Local Civil Rule 56.1(a) requires a party moving for summary judgment to submit a statement of material facts not in dispute, and requires the opposing party to file "a responsive statement of material facts, addressing each paragraph of the movant's statement," and provides that "any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion." L. Civ. R. 56.1(a). This Court's own individual procedures likewise advise that failure to file such a responsive statement "will lead to the Court's consideration of the moving party's factual assertion(s) as undisputed."[2] Plaintiff did not file a responsive Rule 56.1 statement in opposition to this motion. Accordingly, the properly supported facts set out in the SOMF are deemed undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e)(2).

Plaintiff's procedural default does not, however, resolve this motion. The DOC Defendants' Statement of Material Facts—like their Certification of Counsel and their brief—itself relies extensively on Plaintiff's deposition testimony, and Plaintiff's opposition brief cites specific pages of that same testimony to identify the facts he contends are genuinely disputed. Rule 56(c)(3) permits the Court to consider record materials beyond those specifically highlighted by a party's Rule 56.1 submission, and the Court does so here. The Court therefore treats the Statement

---

[2] Hon. Evelyn Padin, U.S.D.J., *General Pretrial and Trial Procedures* § II.F (D.N.J. September 10, 2026), https://www.njd.uscourts.gov/sites/njd/files/EPProcedures.pdf.

of Material Facts as undisputed except where Plaintiff has identified specific, admissible record evidence—principally his own deposition testimony—that controverts it.

## III. DISCUSSION

### A. First Amendment Retaliation—Governing Framework

To establish a First Amendment retaliation claim, a plaintiff must show that (1) he engaged in constitutionally protected activity; (2) he suffered an adverse action "sufficient to deter a person of ordinary firmness from exercising his constitutional rights"; and (3) the protected activity was "a substantial or motivating factor" in the defendant's decision to take that action. *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001). A plaintiff may prove the requisite motive with evidence of either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing that suggests a causal link." *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). If the plaintiff makes that showing, the burden shifts to the defendant to prove, by a preponderance of the evidence, that it "would have taken the same [adverse] action even in the absence of the protected activity." *Rauser*, 241 F.3d at 333–34.

For purposes of this Motion, the DOC Defendants do not dispute the first two elements: that Plaintiff's filing of this lawsuit was constitutionally protected activity, or that the cell searches he complains of constitute adverse action. Def. Br. at 13. The Motion instead turns on causation (Point I of Defendants' brief), each Defendant's personal involvement (Point II), qualified immunity (Point III), and the availability of damages and equitable relief (Points IV and V). The Court addresses each in turn.

**B. Causation**

*1. Defendant Correa-Marti*

It is undisputed that Correa-Marti testified he did not learn of this lawsuit until DOC personnel informed him of it on October 23, 2023—after every search date the TAC identifies. SOMF ¶ 45. Standing alone, that testimony would sever any causal link between Plaintiff's protected activity and Correa-Marti's conduct. *See Giuseffi v. Sec'y U.S. Dep't of Homeland Sec.*, 810 F. App'x 96, 101 (3d Cir. 2020) ("No prior knowledge means no causation.").

But Correa-Marti's testimony does not stand alone. The TAC alleges that Correa-Marti "evidently learned" Plaintiff had named him as a defendant shortly after the original complaint was filed in March 2022, notwithstanding the absence of formal service. TAC ¶ 76. More significantly, Plaintiff testified under oath that during a cell search, Correa-Marti was seen reading a folder marked "attorney-client privilege" bearing Plaintiff's name, and asked Plaintiff who he had been speaking to about a "legal matter"—testimony consistent in substance with the TAC's separate allegation that Correa-Marti asked Plaintiff "whom he had been talking to about 'legal matters'" during the July 2, 2022 search. Benton Dep. 78:13-21, 78:24-79:11; TAC ¶¶ 79-80. Whether these accounts describe the same incident or two similar ones, a jury crediting could reasonably find that Correa-Marti had some awareness of Plaintiff's legal activity considerably earlier than October 23, 2023—conflicting with his own deposition denial. That is a credibility dispute for a jury, not a legal question for the Court. *Scott*, 550 U.S. at 380 (declining to credit the non-movant's account only where it is "blatantly contradicted by the record, so that no reasonable jury could believe it"). No such contradicting video or documentary evidence is present here. A reasonable jury could also draw an inference of retaliatory motive from timing alone: several of the March 2022 searches occurred within around two weeks of the original filing—an unusually suggestive proximity that permits, though does not require, a finding of retaliatory motive.

*Watson*, 834 F.3d at 422. Thus, summary judgment on causation will be **DENIED** as to Correa-Marti.

*2. Defendants Chetirkin, Loney, and Grosskopf*

The evidence of Defendants Chetirkin, Loney, and Grosskopf's awareness of the lawsuit is thinner, but it is not absent. Plaintiff testified that Loney personally ordered searches of his cell on multiple occasions, Benton Dep. 116:4–19, 119:8–120:11, and that Loney and Grosskopf "were supervising the searches," *id.* 42:21–23. Yet Plaintiff also testified that Loney and Grosskopf were "more than likely" supervising because they were "the Sergeants who were working the unit." *Id.* 112:17–113:3. Plaintiff also testified that Chetirkin admitted he was aware of, directed, and supported what was occurring and responded defensively when Plaintiff complained that Correa-Marti had failed to document a search. *Id.* 115:2–118:2.

Combined with the suggestive timing of searches clustered shortly after the original filing, a reasonable jury could infer that the supervisory personnel directing and reviewing the searches knew of the lawsuit before the challenged searches and allowed that knowledge to inform their decisions. This is a closer question than for Correa-Marti, but the record is not so one-sided that no reasonable jury could find causation. Summary judgment on this element will be **DENIED** as to Chetirkin, Loney, and Grosskopf.

*3. The same-decision defense*

The DOC Defendants separately argue that, even if retaliatory motive could be shown, they would have conducted the same searches, in the same manner, irrespective of the lawsuit, given the documented STU-wide contraband problem and the post-COVID increase in searches. Def. Br. at 16–18; SOMF ¶¶ 27–38. The same-decision defense may ultimately persuade a factfinder. But summary judgment on that defense is improper where record evidence would permit a reasonable factfinder to reject it. *See Watson*, 834 F.3d at 425–26.

Here, Plaintiff testified that Correa-Marti did not follow the recording and logging practice Plaintiff understood to apply, appeared to read documents from an attorney-client folder, and questioned Plaintiff about legal matters. Benton Dep. 78:2–79:11, 84:1–85:10. Plaintiff also described officers damaging personal property and handling food with the same gloves used to search a toilet, while Correa-Marti testified that officers generally did not change gloves during a search unless the gloves broke. *Id.* 35:6–19, 37:4–19; Correa-Marti Dep. 31:9–23. Although the undisputed record supplies legitimate reasons for searching STU cells generally, this testimony would permit a jury to find that the manner and targeting of the challenged searches went beyond what the facility-wide contraband response would independently explain. The defense therefore cannot be resolved as a matter of law on this record.

**C. Personal Involvement**

A defendant sued in his individual capacity under 42 U.S.C. § 1983 may not be held liable on a theory of *respondeat superior*. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). He must instead have "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004); *see also Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (personal involvement "can be shown through allegations of personal direction or of actual knowledge and acquiescence" (quoting *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988))). Speculation and conjecture are not enough. *See Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014).

The DOC Defendants do not challenge Correa-Marti's personal involvement on this motion. Def. Br. at 18 (Point II directed only at Chetirkin, Crothers, Loney, and Grosskopf). As to Loney and Grosskopf, Plaintiff's testimony that Loney personally ordered searches of his cell on multiple occasions, Benton Dep. 116:4–19, 119:8–120:11, together with his testimony that both

Sergeants were supervising the searches—stated unambiguously at one point, *id.* 42:21–23, and in more qualified terms ("more than likely," "[b]ecause they were the Sergeants who were working the unit") at another, *id.* 112:17–113:3—is sufficient, with reasonable inferences drawn in Plaintiff's favor to raise a genuine dispute about Loney and Grosskopf's personal involvement. As to Chetirkin, his asserted awareness and direction of the challenged conduct, *see supra* Section I.A, reflects more than passive supervisory awareness; if credited, it is evidence of direction and acquiescence sufficient to survive summary judgment.

Crothers is different. Plaintiff's own opposition brief concedes that "[n]o testimonial evidence was elicited concerning" Crothers. Opp. Br. at 20. The TAC's Third Cause of Action does not name Crothers among the defendants in its caption, TAC at 16, and none of its operative paragraphs mentions him by name, *id.* ¶¶ 96–103. The only record evidence connecting Crothers to the events at issue is that he personally reviewed and closed two of Plaintiff's JPay grievances—responding "This is redundant. TY" to one, and explaining the STU's search frequency and rationale in response to another. D.E. 107-15, Ex. GG; D.E. 107-16, Ex. HH. Review and denial of a grievance, without more, does not establish the personal involvement required to sustain § 1983 liability. *Simonton v. Tennis*, 437 F. App'x 60, 62 (3d Cir. 2011). Because Plaintiff has not identified evidence from which a reasonable jury could find that Crothers personally participated in, directed, or knowingly acquiesced in the searches at issue, the DOC Defendants are entitled to summary judgment in Crothers's favor, and the Court does not separately reach the causation, qualified immunity, or damages arguments as to him. Summary judgment will be **GRANTED** as to Crother.

### D. Qualified Immunity

Qualified immunity shields a government official from liability for civil damages unless (1) the facts, viewed in the light most favorable to the plaintiff, show that the official's conduct

violated a constitutional right, and (2) that right was clearly established at the time of the conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). Courts may address the two prongs in either order. *Pearson v. Callahan*, 555 U.S. 223, 235–36 (2009).

The Court already addressed the clearly established prong in its September 13, 2024, Opinion, framing the right at the appropriate level of particularity as "the right of a civilly committed person to be free from retaliatory cell searches because they filed a lawsuit," and holding that a reasonable officer in March 2022 would have understood that retaliating against a civilly committed person with cell searches because he filed suit was unconstitutional. D.E. 68, at 14 (citing *Atkinson v. Taylor*, 316 F.3d 257, 269 (3d Cir. 2003), and *Milhouse v. Carlson*, 652 F.2d 371, 373–74 (3d Cir. 1981)). The Court denied qualified immunity on that basis at the pleading stage, expressly noting the defense could be revisited once the factual record was developed. *Id.*

The DOC Defendants now press a broader framing—a right to be exempted from "increased cell searches" generally—and argue no such right was clearly established given civilly committed residents' diminished expectation of privacy. Def. Br. at 22–27; *see Barber v. Christie*, No. 10-1888, 2010 WL 2723151, at *13 (D.N.J. July 7, 2010); *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). That reframing conflates two distinct questions. No one disputes that STU residents may be searched, including at an increased frequency, for legitimate security reasons; that is not the right at issue and never has been in this case. The right this Court has already identified is narrower and more particular: freedom from cell searches specifically motivated by retaliation for filing a lawsuit. *See Mullenix*, 577 U.S. at 12 (holding that clearly established law must not be defined "at a high level of generality," but must address "the particular conduct" at issue). Framed at that level of particularity—the level at which this Court has already analyzed it—the right was clearly established by March 2022.

Whether the DOC Defendants' conduct was in fact motivated by retaliation—and therefore whether a constitutional violation occurred at all—turns on the same genuinely disputed facts discussed in Section III.B, *supra*. Where, as here, the historical facts material to a qualified immunity determination are themselves disputed, that determination cannot be made on summary judgment but must await resolution of the underlying factual dispute. *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002). If the factfinder credits the DOC Defendants' account, no constitutional violation occurred; if it credits Plaintiff's account, the right violated was clearly established, and qualified immunity will not shield them. Summary judgment on qualified immunity is therefore **DENIED** as to Chetirkin, Loney, Grosskopf, and Correa-Marti.

**E. Damages and Equitable Relief**

*1. Compensatory damages*

The DOC Defendants are also not entitled to summary judgment on Plaintiff's claim for compensatory damages. Section 1983 provides a remedy for injuries caused by the deprivation of constitutional rights, and compensatory damages are intended to redress the actual harm caused by the constitutional violation. *See Carey v. Piphus*, 435 U.S. 247, 254–55 (1978); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986). Thus, Plaintiff may not recover compensatory damages merely for the abstract value of his First Amendment rights. He must instead present evidence from which a jury could find that the alleged retaliation caused him an actual injury.

Plaintiff has sufficiently done so here to survive summary judgment. Plaintiff testified that the searches left him "angry," "frustrated," and "emotionally charged." Benton Dep. 35:14–19. His contemporaneous JPay grievances likewise described the searches as affecting his mental health and his ability to participate meaningfully in therapy. D.E. 107-10, Ex. BB. This evidence, viewed in the light most favorable to Plaintiff, permits a reasonable jury to find that the alleged retaliatory searches caused him emotional distress.

The absence of expert or medical testimony does not compel a different result. Expert medical evidence is not required to prove emotional distress under § 1983, but the plaintiff must present evidence of actual injury; a vague assertion that the plaintiff was merely upset is insufficient. *See Bolden v. Se. Pa. Transp. Auth.*, 21 F.3d 29, 34–36 (3d Cir. 1994); *Chainey v. Street*, 523 F.3d 200, 216 (3d Cir. 2008). Plaintiff offered more than a bare statement that he was upset: he described the nature of the distress and contemporaneously stated that the searches affected his mental health and impaired his participation in therapy. That description of his distress and mental health is sufficient to create a triable issue—its weight and the extent of any compensable injury remain for the jury.

The same evidence also distinguishes this case from one in which a plaintiff alleges a constitutional violation but identifies no resulting injury. Plaintiff has identified a concrete category of harm—emotional distress allegedly caused by the manner and frequency of the searches—and has pointed to record evidence supporting that assertion. Whether that evidence ultimately establishes the existence and extent of compensable injury is for the jury. Accordingly, summary judgment on compensatory damages is **DENIED**.

*2. Punitive damages*

The Court likewise declines to grant summary judgment on punitive damages. Punitive damages may be awarded under § 1983 when a defendant's conduct is motivated by evil motive or intent, or when it involves reckless or callous indifference to the plaintiff's federally protected rights. *Smith v. Wade*, 461 U.S. 30, 56 (1983). The question at this stage is not whether Plaintiff has established that mental state, but whether the evidence, viewed in his favor, would permit a reasonable jury to find it.

The record permits that finding. As discussed above, Plaintiff has presented evidence from which a jury could find that the searches were undertaken, at least in part, because he filed this

lawsuit. But the evidence, if credited, would support more than an inference of retaliatory motive. Plaintiff identifies alleged departures from DOC's own search procedures, including failures to videotape searches and the alleged mislabeling of a non-routine search as routine. He further testified that officers destroyed or damaged personal property, used gloves after searching his toilet to handle food, and that Defendant Correa-Marti read a folder marked "attorney-client privilege" and questioned Plaintiff about his legal activity. *See* Benton Dep. 35:14-19, 78:13-21, 78:24-79:11; TAC ¶¶ 39, 45-46, 79-80.

A jury crediting that evidence could reasonably find that the challenged conduct was not merely an authorized security measure that happened to burden Plaintiff, but rather conduct undertaken with a retaliatory motive and with reckless or callous disregard for Plaintiff's First Amendment rights. That is sufficient to create a triable issue as to punitive damages. *See Smith*, 461 U.S. at 56.

The Court emphasizes, however, that the availability of punitive damages depends on the jury's findings concerning each Defendant's conduct and state of mind. The Court does not hold that punitive damages are warranted, only that the present record does not foreclose them as a matter of law. Accordingly, summary judgment on compensatory damages is **DENIED** as to Chetirkin, Loney, Grosskopf, and Correa-Marti.

*3. Declaratory and injunctive relief*

The DOC Defendants argue that any claim for declaratory or injunctive relief is moot because the increased, contraband-driven searches ended when the Search Team transitioned to an "as needed" basis on July 17, 2023. SOMF ¶ 38. Mootness is jurisdictional, and an unopposed argument does not relieve the Court of its obligation to confirm that a live controversy no longer exists. Because the schedule change was the DOC Defendants' own conduct, they bear the "formidable burden" of showing that it is "absolutely clear" the challenged behavior could not

reasonably recur. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). The undisputed record shows that the dedicated increased-search program transitioned to an as-needed schedule more than three years ago. Plaintiff identifies no evidence that the program resumed or that the named Defendants continued the alleged targeted conduct after that transition, and his opposition does not address mootness or identify any ongoing or threatened retaliation. On this record, no effective prospective relief remains available. *See Wilmington Firefighters Loc. 1590 v. City of Wilmington*, 824 F.2d 262, 266 (3d Cir. 1987). The Court will therefore **DISMISS** any claim for declaratory or injunctive relief as **MOOT**.

## IV. CONCLUSION & ORDER

For the foregoing reasons,

**IT IS**, on this 14th day of September, 2026,

**ORDERED** that the DOC Defendants' motion for summary judgment, D.E. 107, is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the Motion is is **GRANTED** as to Defendant Jeffrey Crothers, in whose favor judgment will be entered; and it is further

**ORDERED** that Plaintiff's claims for declaratory and injunctive relief are **DISMISSED** as **MOOT**; and it is further

**ORDERED** that the Motion is **DENIED** in all other respects; and it is finally

**ORDERED** that Plaintiff's Third Cause of Action for First Amendment retaliation, including his claims for compensatory and punitive damages, remains pending against Defendants Chetirkin, Loney, Grosskopf, and Correa-Marti.

Evelyn Padin, U.S.D.J.